**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| INTERGOVERNMENTAL RISK MANAGEMENT AGENCY and INTERGOVERNMENTAL PERSONNEL BENEFIT COOPERATIVE, <br><br> Plaintiff, <br><br> v. <br><br> PURDUE PHARMA L.P.; PURDUE PHARMA INC.; PURDUE FREDERICK COMPANY, INC.; RHODES PHARMACEUTICALS; CEPHALON INC; TEVA PHARMACEUTICALS INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; ENDO INTERNATIONAL PLC; JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC.; NORAMCO, INC; ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC; ACTAVIS PLC, WATSON PHARMACEUTICALS INC.; WATSON LABORATORIES INC.; ACTAVIS PHARMA INC.; ACTAVIS LLC; MALLINCKRODT, PLC; MALLINCKRODT, LLC; AMERICAN ACADEMY OF PAIN MEDICINE; AMERICAN GERIATRIC SOCIETY; AMERICAN PAIN SOCIETY; AMERISOURCEBERGEN CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; PAUL MADISON; and JOSEPH GIACCHINO <br><br> Defendants. | Civil Action No. _____ <br> (Removal from: Circuit Court of Cook County) |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441, 1446, and 1367, Defendant McKesson Corporation ("McKesson") has removed the above-captioned action from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois. . As grounds for removal, McKesson states:

## I.     NATURE OF REMOVED ACTION

1.     On October 15, 2018, the Intergovernmental Risk Management Agency and Intergovernmental Personnel Benefit Cooperative ("Plaintiffs") filed *Intergovernmental Risk Management Agency and Intergovernmental Personnel Benefit Cooperative v. Purdue Pharma L.P.* in the Circuit Court of Cook County. . The court assigned the case Docket No. 2018-CH-12828.

2.     The Complaint asserts claims against four groups of Defendants. .

3.     The first group of defendants consists of Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company Inc., Rhodes Pharmaceuticals, L.P., Cephalon, Inc., Teva Pharmaceutical Industries Ltd., incorrectly named as "Teva Pharmaceutical Industries, Ltd.", Teva Pharmaceuticals USA, Inc. Allergan plc f/k/a Actavis plc, Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis Pharma, Inc., Actavis LLC,[1] Janssen Pharmaceuticals, Inc., Johnson & Johnson, Inc., Noramco, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Endo Health Solutions Inc., Endo

---

[1] Though Plaintiffs have named Actavis LLC on the face page of the Complaint, that entity is not mentioned anywhere in the body of the Complaint. In defining the term "Actavis", Plaintiffs allege that term refers collectively to Actavis, Actavis PLC, Actavis Pharma, Inc., Actavis Elizabeth, LLC, Actavis Kadian LLC, Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc., but not Actavis LLC. Compl. ¶¶ 29-30.

Pharmaceuticals Inc., Endo International plc,[2] Mallinckrodt, plc, and Mallinckrodt LLC (collectively, the "Manufacturer Defendants"). . Compl. ¶¶ 27-34.

4.      The second group of defendants consists of the American Academy of Pain Medicine, the American Geriatrics Society, and the American Pain Society (collectively, the "Front Group Defendants"). Compl. ¶¶ 35-37.

5.      The third group of defendants consists of AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation (collectively, the "Distributor Defendants"). Compl. ¶¶ 36-40.

6.      The fourth group of defendants consists of Paul Madison and Joseph Giacchino (collectively, the "Prescriber Defendants"). Compl. ¶¶ 43-45.

7.      The Complaint purports to assert four counts against McKesson and the other Distributor Defendants: violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (Count I), negligence (Count V), public nuisance (Count VI), and unjust enrichment (Count IX). *See* Compl. ¶¶ 694-800.

8.      Plaintiffs do *not* assert that federal jurisdiction is lacking. *See* Compl. ¶¶ 21-23.

9.      Plaintiffs plead, among other things, that Distributor Defendants owe a duty under federal law "to report suspicious orders of opioids, and not to fill suspicious orders unless and until due diligence had eliminated the basis for its suspicion[,]" Compl. ¶ 750, and that Distributor Defendants "breached their duties . . . by filling unreasonably suspect orders over and over again,

---

[2] Though Plaintiffs have named Endo International plc on the face page of the Complaint, that entity is not mentioned anywhere in the body of the Complaint. In defining the term "Endo," Plaintiffs allege that that term refers collectively to Endo Health Solutions Inc. and Endo Pharmaceuticals Inc., and Par Pharmaceutical, but not Endo International plc. (Compl. ¶ 32.)

without imposing basic controls to monitor, identify, investigate, limit, and report suspicious orders for opioids." *Id.* ¶ 751.

10.     Because the duties governing reporting and shipping "suspicious" opioid orders arise from the federal Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801, *et seq.*, and its implementing regulations, Plaintiffs plead that alleged violations of federal law form the basis for their claims.

11.     McKesson has not responded to the Complaint and has no obligation to do so prior to being served with the Complaint.

12.     On December 5, 2017, the Judicial Panel on Multidistrict Litigation (JPML) formed a multidistrict litigation (MDL) and transferred opioid-related actions to Judge Dan Polster in the Northern District of Ohio pursuant to 28 U.S.C. § 1407. *See In re Nat'l Prescription Opiate Litig.*, 1:17-MD-2804 (J.P.M.L. Dec. 5, 2017), ECF No. 328. More than 1,000 opioid-related actions are pending in the MDL, including actions originally filed in this Court.[3]

13.     McKesson intends to tag this case immediately for transfer to the MDL.

14.     In accordance with 28 U.S.C. § 1446(a), copies of the docket sheet and all process, pleadings, and orders served on McKesson in the state court action are attached as **Exhibit A**.

## II.     <u>TIMELINESS OF REMOVAL</u>

15.     Plaintiff has not yet served the Complaint on McKesson. Accordingly, the 30-day removal period contemplated by 28 U.S.C. § 1446(b) has not yet begun to run. *See Murphy Bros.,*

---

[3] *See, e.g.*, *Chicago v. Purdue Pharma L.P. et al.*, No. 1:14-cv-4361 (N.D. Ill.) (removed from state court, and transferred to the MDL); *Chicago v. Cardinal Health, Inc. et al.*, No. 1:18-cv-1639 (N.D. Ill.) (filed in federal court and transferred to the MDL); *Illinois et al. v. AmerisourceBergen Drug Corp. et al.*, No. 3:18-cv-50093 (N.D. Ill.) (same); *Rockford v. AmerisourceBergen Drug Corp. et al.*, No. 3:18-cv-50092 (N.D. Ill.) (same).

*Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999) (30-day removal period begins upon service of summons and complaint).

## III.     PROPRIETY OF VENUE

16.     Venue is proper in this district under 28 U.S.C. § 1441(a) because the state court where the suit has been pending is in this district. Filing in the Eastern Division is proper because this case is removed from Cook County, which is within the Eastern Division of the Northern District of Illinois.

## IV.     BASIS OF REMOVAL

17.     Removal is proper pursuant to 28 U.S.C. §§ 1441 and 1331 because Plaintiffs' claims present a substantial federal question under the CSA.

18.     The original jurisdiction of the district courts includes jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

19.     "Whether a case arises under federal law for purposes of § 1331" is governed by the "well-pleaded-complaint rule."  *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002).

20.     Even when state law creates the causes of action, a complaint may raise a substantial question of federal law sufficient to warrant removal if "vindication of a right under state law necessarily turn[s] on some construction of federal law."  *Merrell Dow Pharm. Inc., v. Thompson*, 478 U.S. 804, 808-09 (1986) (citation omitted); *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936) ("To bring a case within [§ 1441], a right or immunity created by the

Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.").[4]

21.     "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315 (2005). "Where all four of these requirements are met . . . jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum, which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Gunn*, 568 U.S. at 258.

22.     As set forth below, this case meets all four requirements.[5]

---

[4] A defendant need not overcome artificial presumptions against removal or in favor of remand. In *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691 (2003), the Supreme Court unanimously held that the 1948 amendments to the general federal removal statute, 28 U.S.C. § 1441(a), trumped the Court's prior teachings in *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941), and its antecedents, that federal jurisdictional statutes must be strictly construed against any recognition of federal subject matter jurisdiction, with every presumption indulged in favor of remand. *Id.* at 697-98 ("[W]hatever apparent force this argument [of strict construction against removal] might have claimed when *Shamrock* was handed down has been qualified by later statutory development. . . . Since 1948, therefore, there has been no question that whenever the subject matter of an action qualifies it for removal, *the burden is on a plaintiff to find an express exception.*") (emphasis added); *see also Exxon Mobil Corp. v Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) (construing 1990 enactment of 28 U.S.C. § 1367, authorizing supplemental federal subject matter jurisdiction, and holding: "We must not give jurisdictional statutes a more expansive interpretation than their text warrants; but it is just as important not to adopt an artificial construction that is narrower than what the text provides . . . Ordinary principles of statutory construction apply.") (citation omitted).

More recently, a unanimous Supreme Court in *Mims v. Arrow Financial Services, LLC* held: "Divestment of district court jurisdiction should be found no more readily than divestment of state court jurisdiction, given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. § 1331." 565 U.S. 368, 379 (2012) (brackets, citations, and internal quotation marks omitted).

[5] The substantiality inquiry as it pertains to federal question jurisdiction is distinct from the merits of the case and has no bearing on the strength of Plaintiffs' underlying claims. *See Gunn v. Minton*,

23.     Although Plaintiffs ostensibly plead some of their theories of recovery against McKesson as state law claims, they base the underlying theory of liability on McKesson's alleged violations of federal law or alleged duties arising out of federal law, specifically the CSA, *i.e.*, that a portion of its otherwise lawful shipments of prescription opioids were unlawful because they were shipped in fulfillment of suspicious orders that McKesson allegedly had a duty to identify, report, and then not ship. *See, e.g.*, Compl. ¶¶ 575-76; 582-83; 750-51; 761-64.

24.     The source of the asserted legal duty to monitor and report suspicious orders of controlled substances is the CSA and its implementing regulations. *See* Compl. ¶ 580, n. 152 (citing 21 U.S.C. §§ 827(a)(3), 1304.21(a) and 1304.22(b) as the source of the duty to "maintain complete and accurate records of all controlled substances"); Compl. ¶ 582, n. 154 (citing 21 C.F.R. § 1301.74(b) as the source of the duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances").

25.     The source of the asserted legal duty to suspend shipment of suspicious orders is 21 U.S.C. § 823(b) and (e), as interpreted by the Drug Enforcement Administration ("DEA") of the United States Department of Justice. Specifically, DEA interprets the public interest factors for registering distributors under the CSA, 21 U.S.C. § 823(b) and (e), to impose a responsibility on distributors to exercise due diligence to avoid filling suspicious orders that might be diverted to unlawful uses. *See Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212-13 (D.C. Cir. 2017) (citing *In re Southwood Pharm., Inc.*, Revocation of Registration, 72 Fed. Reg. 36,487, 36,501, 2007 WL 1886484 (Drug Enf't Admin. July 3, 2007), as source of DEA's "Shipping Requirement"). Plaintiffs make this same allegation in their complaint. Compl. ¶ 583, n.157 (citing *Masters*

---

568 U.S. 251, 260 (2013) ("The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole.").

*Pharm.* for the source of the federal duty to report, investigate, and halt suspicious orders); ¶ 593 (citing *Southwood Pharm.* for "provid[ing] additional criteria to use when determining whether an order is suspicious . . . [including] orders of an unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency.").

26.     Here, Plaintiffs' theories of liability against McKesson and other Distributor Defendants, as pled in the Complaint, are predicated on allegations that McKesson and Distributor Defendants breached alleged duties under the CSA to implement effective controls to detect and report "suspicious" pharmacy orders for prescription opioids and—crucial to Plaintiffs' claims—to refuse to ship such orders to Illinois pharmacies.

27.     Specifically, Plaintiffs plead that McKesson and the other Distributor Defendants violated federal law with, among others, the following allegations:

> a.     "[F]ederal law requires distributors like the Distributor Defendants to investigate, report, and stop suspicious orders of prescription opioids . . . In creating the Controlled Substance Act, Congress recognized that distributors are 'one of the key components of the distribution chain' and 'must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.'" Compl. ¶ 576.

> b.     "Prior to the establishment of the DEA, the Bureau of Narcotics and Dangerous Drugs issued regulations in 1971 in accordance with the objectives of the Controlled Substances Act. The regulations, among other things, require distributors to maintain complete and accurate records of all controlled substances transactions, that is, at any point controlled substances are manufactured, imported, sold, received, delivered, exported,

or otherwise disposed of . . . The regulations also require distributors to report their controlled substances transactions to the DEA, which monitors the distribution of controlled substances using an automated, comprehensive reporting system known as the Automation of Reports and Consolidation Orders System ("ARCOS")." Compl. ¶¶ 580-81.

c.  "Distributors are also required to 'design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.' 'Suspicious' orders include 'orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.'" Compl. ¶ 582.

d.  "Commensurate with the obligation to identify and report suspicious orders is the distributor's obligation to conduct a meaningful investigation into the customer and the order in question to resolve the suspicion (i.e., to verify that the order is actually being used to fulfill legitimate medical needs) before distributing the order. 'Once a distributor has reported a suspicious order, it must make one of two choices: decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order.'" Compl. ¶ 583.

e.  "The DEA has also spelled out in detail to Distributor Defendants the purpose and proper implementation of suspicious order reporting programs in three letters . . . The September 27, 2006 Letter also provided that 'in addition to reporting all suspicious orders, a distributor has a statutory

responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels.'" Compl. ¶¶ 589-91.

f.   "Notwithstanding the ample guidance available, Distributor Defendants have failed to maintain adequate suspicious order reporting systems. As a result, and as explained below, Distributor Defendants flooded many communities with opioids, including the communities surrounding Plaintiffs' members, while consistently failing to report or suspend suspicious orders." Compl. ¶ 595.

g.   "In an Administrative Memorandum of Agreement entered into between McKesson, the DOJ, and the DEA, McKesson acknowledged that, as documented above, it had not adequately reported suspicious orders of opioids from 2008 to 2013, nor implemented the monitoring and reporting programs it had agreed to in 2008 . . . [and] that at various times during the Covered Time Period, [McKesson] did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious in a manner fully consistent with the requirements set for the 2008 MOA." Compl. ¶¶ 627-28.

h.   "Defendants' unlawful, unfair, and fraudulent business practices include the filling of suspicious or invalid orders for prescription opioids at both the wholesale and retail level; failing to operate an effective system to disclose suspicious orders of controlled substances; failing to report suspicious orders of controlled substances; failing to reasonably maintain necessary

records of opioid transactions; and deliberately ignoring questionable and/or obviously suspicious orders and filling them anyway." Compl. ¶ 707.

i. "Each Distributor Defendant had a duty . . . to maintain effective controls against diversion and misuse of prescription opioids, to report suspicious orders of opioids, and not to fill suspicious orders unless and until due diligence had eliminated the basis for its suspicion. Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of prescription opioids by filling unreasonably suspect orders over and over again, without imposing basic controls to monitor, identify, investigate, limit, and report suspicious orders for opioids." Compl. ¶¶ 750-51.

j. "As described herein, Defendants have created a continuing public nuisance in Plaintiffs' member communities through their conduct by creating a medical consensus for prescribing patterns that have adverse effects on patient welfare, including . . . It was unreasonable for Distributor Defendants to fail to design and operate a system that would disclose the existence of suspicious orders and/or fail to report and halt suspicious orders[.]" Compl. ¶¶ 761-64.

28.     In alleging that Distributor Defendants owe a duty to "investigate, report, and stop suspicious orders of prescription opioids[,]" Compl. ¶ 576. Plaintiffs rely *entirely* on federal law and Illinois laws that merely references and incorporate federal law. Specifically, Plaintiffs cite Illinois Admin Code § 1510.50(i), which states only that "[w]holesale drug distributors shall operate in compliance with applicable federal, state and local laws and regulations" and that

"[w]holesale drug distributors who deal in controlled substances shall register with the appropriate state controlled substance authority and with the Drug Enforcement Administration (DEA), and shall comply with all applicable state, local and DEA regulations."  Similarly, Plaintiffs cite the Illinois Controlled Substances Act ("ILCSA") as requiring distributors to "provide effective controls and procedures to guard against theft and diversion[,]" *see* Compl. ¶ 577 (citing 720 ILCS 570/201 (h)), but those measures are merely routine security requirements that have no bearing on any alleged duty to report or halt suspicious orders. Plaintiffs do not and cannot identify a state law that specifically requires wholesale pharmaceutical distributors to "investigate, report, and stop suspicious orders of prescription opioids."[6] Compl. ¶ 576. To the extent that the Illinois statute incorporates by reference the CSA and its implementing regulations pertaining to suspicious orders, any potential duties to monitor, report or halt suspicious orders could be understood *only* by interpreting *federal* law.

29.     Moreover, Plaintiff's theory of liability also relies on an expansive reading of federal law that calls into question an agency determination. Plaintiff alleges not only that Distributor Defendants should have detected and reported discrete suspicious orders by individual pharmacies, but that Distributor Defendants should have recognized that the *total volume* of prescription opioids distributed to various regions was suspicious or unreasonable. *See, e.g.*, Compl. ¶ 629-30 (alleging that McKesson "failed to adequately flag suspicious orders" in part because it "set customer 'thresholds' for opioid orders a inappropriately high levels[,]" and citing as an example the volume of hydrocone pills delivered to a county in West Virginia.).

---

[6] None of the other Illinois laws cited in Plaintiffs' Complaint creates any independent obligation to detect, report, or refuse to fill suspicious orders. For instance, the Wholesale Drug Distribution Licensing Act, 225 ILCS 120/1 *et seq*, requires that distributors keep records of transactions involving prescription drugs and secure controlled substances from diversion, but neither references, nor imposes any duties with respect to suspicious orders.

30.     To succeed on that theory, Plaintiff would thus have to show that the total quantity of prescription opioids that Distributor Defendants distributed was unreasonable. However, the total amount of prescription opioids distributed in any given year turns on annual aggregate production quotas established by the DEA. Specifically, the DEA must "determine the total quantity of each basic class of controlled substance listed in Schedule I or II necessary to be manufactured during the following calendar year to provide for the estimated medical, scientific, research and industrial needs of the United States, for lawful export requirements, and for the establishment and maintenance of reserve stocks."  21 C.F.R. § 1303.11(a). In making this determination, the DEA must consider "[p]rojected demand" for such substances. 21 C.F.R. § 1303.11(b). Thus, to show that the total quantity of prescription opioids that Distributor Defendants distributed was unreasonable, Plaintiff would have to show that the annual aggregate production quotas set by the DEA, pursuant to a federal statute, were themselves unreasonable.[7]

31.     The federal question presented by Plaintiffs' claims therefore is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

32.     *First*, Plaintiffs' state law claims "necessarily raise" a federal question because "[t]he resolution of this case turns on issues of federal law." *Evergreen Square of Cudahy v. Wisc. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 467 (7th Cir. 2015); *see also N. Carolina ex rel. N. Carolina Dep't of Admin. v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 146 (4th Cir. 2017)

---

[7] Moreover, 21 U.S.C. § 827(d)(1) requires Distributor Defendants to report to DEA "every sale, delivery or other disposal" by them of prescription opioids. In other words, Distributor Defendants already report to DEA the total volume of prescription opioids distributed. To succeed on its theory of liability that Distributor Defendants should have recognized and reported that the total volume of prescription opioids was unreasonable, Plaintiff would have to show that Distributor Defendants' existing reporting to the DEA was inadequate.

("Regardless of the allegations of a state law claim, where the vindication of a right under state law necessarily turns on some construction of federal law, the claim arises under federal law and thus supports federal question jurisdiction under 28 U.S.C. § 1331.") (alteration omitted); *Virgin Islands Hous. Auth. v. Coastal Gen. Constr. Servs. Corp.*, 27 F.3d 911, 916 (3d Cir. 1994) ("[A]n action under 28 U.S.C. § 1331(a) arises only if the complaint seeks a remedy expressly granted by federal law *or if the action requires construction of a federal statute*, or at least a distinctive policy of a federal statute requires the application of federal legal principles.") (emphasis added).

33.     As pled, Plaintiffs' claims against McKesson and the other Distributor Defendants require Plaintiffs to establish that Distributor Defendants breached duties necessarily defined by reference to federal law, by failing to report and stop shipments of otherwise lawful orders of controlled substances to Illinois.

34.     For example, in pleading negligence *per se*, Plaintiffs cites to a host of federal and Illinois laws, claiming that Distributor Defendants "breached their duties to . . . monitor, identify, investigate, limit, and report suspicious orders for opioids." Compl. ¶751; *see also* Compl. ¶ 750 ("Each Distributor Defendant had a duty under, *inter alia*, 21 U.S.C. § 801 et seq., 21 C.F.R, § 1301. 74, 720 ILCS 570/303, and Ill. Admin. Code tit. 68, § 1510.50 . . . to report suspicious orders of opioids, and not to fill suspicious orders unless and until due diligence had eliminated the basis for its suspicion."). Notably, Plaintiffs appear to acknowledge that the source of the duty to report or halt suspicious orders is the federal CSA and its implementing regulations, and contends that these federal obligations are "expressly incorporated . . . into state law[.]" *Id.* ¶ 584. The "express incorporation of a federal law into the state statute on which the plaintiffs' cause of action is grounded" necessarily raises an "embedded federal question," and "[n]o more is exigible to surmount the first step of the *Grable* progression." *Rhode Island Fishermen's All., Inc. v. Rhode*

*Island Dep't Of Envtl. Mgmt.*, 585 F.3d 42, 49 (1st Cir. 2009); *see also NASDAQ OMX Grp., Inc. v. UBS Sec.*, LLC, 770 F.3d 1010, 1022 (2d Cir. 2014) ("The Services Agreement incorporates NASDAQ's rules by reference, but NASDAQ's duties to promulgate those rules and then to adhere to them were dictated by federal law . . . .Thus, UBS's indemnification claims are reasonably understood to seek compensation for losses allegedly caused by NASDAQ's violation of its federal law duties . . . [and] necessarily raise disputed issues of federal law.") (citations omitted); *Gilmore v. Weatherford*, 694 F.3d 1160, 1173 (10th Cir. 2012) ("[Plaintiffs] contend that Oklahoma personal property law includes and incorporates the federal requirement for purposes of the conversion claim. To win under this particular theory of conversion, plaintiffs must show that the Secretary's advance approval is required under federal law . . . . Accordingly, the conversion claim necessarily raise[s] a stated federal issue." (internal citations omitted)); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195 (2d Cir. 2005) ("The first part of the test is clearly met [because] Broder's claim that Cablevision breached a contract term consisting of § 543(d) incorporated by reference . . . necessarily raise[s] the issue of whether Cablevision violated § 543(d)." (internal citations omitted)).

35.   In pleading public nuisance, Plaintiffs claim that "Distributor Defendants intentionally and/or recklessly distribut[ed] and [sold] prescription opioids that they knew, or reasonably should have known, would be diverted to illegal and/or unapproved uses while illegally failing to put appropriate controls in place[.]" Compl. ¶ 761. As Plaintiffs make clear, the "appropriate controls" that Distributor Defendants allegedly failed to implement consist of the very same "system that would disclose the existence of suspicious orders and/or fail to report and halt suspicious orders, as required by the ICSA . . . and the CSA." Compl. ¶ 764. As to the ICSA, Plaintiffs cite 720 ILCS 570, which simply incorporates requirements from the federal CSA.

14

Plaintiffs' public nuisance claim, which is predicated on this duty that "derives directly from federal law," thus necessarily raises disputed issues of federal law. *NASDAQ*, 770 F.3d at 1022.

36.    Although Plaintiffs "may avoid federal jurisdiction by *exclusive* reliance on state law," *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (emphasis added), Plaintiffs here allege violations of federal law as the basis for their state-law claims.[8] The Complaint necessarily raises a federal issue—namely, whether Distributor Defendants violated the CSA by failing to report, prevent, or halt suspicious orders for prescription opioids.

37.    As noted, the Complaint also raises a federal issue because it implicates the actions of a federal agency. *See Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700 (2006) ("The dispute [in *Grable*] centered on the action of a federal agency (IRS) and its compatibility with a federal statute, the question qualified as 'substantial,' and its resolution was both dispositive of the case and would be controlling in numerous other cases."). Specifically, while Plaintiff alleges that the total volume of prescription opioids distributed by Distributor Defendants was unreasonable or suspicious, that figure turns on production quotas set by the DEA. Plaintiff's theory of liability thus calls into question the validity of the DEA's determinations under federal law. *See Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co.*,

---

[8] It is not necessary for federal jurisdiction that McKesson establish that all of Plaintiffs' counts against it raise a federal question. Even if Plaintiffs could prove one or more of those counts without establishing a violation of federal law, this Court still has federal question jurisdiction: "Nothing in the jurisdictional statutes suggests that the presence of related state law claims somehow alters the fact that [the] complaints, by virtue of their federal claims, were 'civil actions' within the federal courts' 'original jurisdiction.'" *Chicago v. Int'l C. of Surgeons*, 522 U.S. 156, 166 (1997).

Because the Court has original jurisdiction over at least one count, it has supplemental jurisdiction over Plaintiffs' remaining counts against McKesson and the other Distributor Defendants, which are so related that they "form part of the same case or controversy." 28 U.S.C. § 1367(a).

29 F. Supp. 3d 808, 862 (E.D. La. 2014) ("While Plaintiff may not be expressly challenging a specific action of a federal agency, the breadth of Plaintiff's claims amounts to a collateral attack on an entire regulatory scheme."); *McKay v. City & Cty. of San Francisco*, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (concluding that complaint necessarily raises federal issue where "plaintiffs' claims are 'inescapably intertwined' with a collateral attack on an [agency] order").

38.     *Second*, this federal issue is "actually disputed" because the parties disagree as to the scope and existence of alleged duties arising under the CSA and whether Distributor Defendants violated duties that, as Plaintiffs plead them, arise only under the CSA. Indeed, this federal issue is the "central point of dispute." *Gunn*, 568 U.S. at 259.

39.     *Third*, the federal issue presented by Plaintiffs' claims is "substantial." "The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. Among other things, the Court must assess whether the federal government has a "strong interest" in the federal issue at stake and whether allowing state courts to resolve the issue will "undermine the development of a uniform body of [federal] law." *Id.* at 260-62 (internal citations omitted). As the Supreme Court explained in *Grable*, "[t]he doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 312.

40.     Plaintiffs' theories of Distributor Defendants' liability necessarily require that a court determine the scope and existence of Distributor Defendants' obligations under federal law because regulation of controlled substances is first and foremost federal regulation. *See* Compl. ¶ 82 ("Because of their potent analgesic and euphoric effects, along with the high potential for

16

addiction . . . prescription opioids like oxycodone and hydrocodone have been classified as Schedule II narcotics under the federal Controlled Substances Act. 21 C.F.R. § 1308.12."). Indeed, Congress designed the CSA with the intent of reducing illegal diversion of controlled substances "while at the same time providing the legitimate drug industry with a *unified approach* to narcotic and dangerous drug control." H.R. Rep. No. 1444, 91st. Cong. (2nd Sess. 1970), *as reprinted in* 1970 U.S.C.C.A.N. 4566, 4571-72 (emphasis added).

41.    Plaintiffs' theories of Distributor Defendants' liability thus "involve aspects of the complex federal regulatory scheme applicable to" the national prescription drug supply chain, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 195 (2d Cir. 2005), and are "sufficiently significant to the development of a uniform body of [controlled substances] regulation to satisfy the requirement of importance to the federal system as a whole," *NASDAQ,* 770 F.3d at 1024. The CSA itself notes that "illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people" and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U.S.C. § 801. Furthermore, "minimizing uncertainty over" reporting obligations under the CSA "fully justifies resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 317-18 (2d Cir. 2016) (alteration and citation omitted); *Rhode Island Fishermen's All., Inc*, 585 F.3d 42, 51 (1st Cir. 2009) (noting, in a case involving state law claims arising out of the implementation of an interstate fisheries compact, "there is a substantial federal interest in ensuring that actions taken in pursuance of the Management Act receive the uniformity of interpretation that a federal forum offers.").

42.     Plaintiffs' attempt to enforce the CSA raises a substantial federal question even though the CSA does not provide for a private right of action. In 2005, in *Grable*, the Supreme Court held that lack of a federal cause of action does *not* foreclose federal question jurisdiction. The Court stated that applying *Merrell Dow* too narrowly would both "overturn[ ] decades of precedent" and "convert[ ] a federal cause of action from a sufficient condition for federal question jurisdiction into a necessary one." *Grable*, 545 U.S. at 317; *see also, e.g.*, *Ranck v. Mt. Hood Cable Reg. Comm'n*, No. 3:16-cv-02409-AA, 2017 WL 1752954, at \*4-\*5 (D. Or. May 2, 2017) (state law claims based on violations of Cable Communications Policy Act raise substantial federal questions and satisfy *Grable* even though no private right of action exists under Act).

43.     Removal is particularly appropriate here because Plaintiffs' action is but one of more than 1,300 similar actions nationwide, of which more than 1,100 are pending in the MDL in the Northern District of Ohio. Indeed, Plaintiffs allege that opioid use and addiction is not merely a local issue, but a "national [] public health crisis." Compl. ¶ 9. The MDL judge, Judge Polster, is attempting to achieve a national solution to this nationwide problem.[9]

44.     *Fourth*, and finally, the federal issue also is capable of resolution in federal court "without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Federal courts exclusively hear challenges to DEA authority to enforce the CSA against pharmaceutical distributors, and litigating this case in a state court runs the risk of the state court applying federal requirements inconsistently with the manner in which the federal agency tasked with enforcing the CSA—the DEA—applies them. Federal jurisdiction is further warranted given

---

[9] Less than two months after the MDL was created, Judge Polster convened the first day-long settlement conference on January 31, 2018. Judge Polster required attendance by party representatives and their insurers and invited state attorneys general and representatives of the DEA and FDA.

the hundreds of similar actions pending in the MDL, which "in the aggregate . . . have the potential to substantially influence the scope and success" of the federal statutory scheme to regulate controlled substances. *Evergreen Square of Cudahy*, 776 F.3d at 468. "Accordingly, the federal government has a strong interest in these issues being decided according to uniform principles[,]" which "will best be achieved by allowing suit in federal courts." *Id.*

45.      In summary, removal of this action is appropriate because Plaintiffs' "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314; *see also, e.g.*, *Evergreen Square of Cudahy*, 776 F.3d at 467-68 (state law claims alleging defendants' breached a contract for Section 8 housing by failing to approve rent increases satisfy *Grable*, raising issues that the "federal government has a strong interest in . . . being decided according to uniform principles."); *New York ex rel. Jacobson*, 824 F.3d at 315-18 (state law claims based on defendant's alleged violation of Internal Revenue Code satisfy *Grable*); *NASDAQ*, 770 F.3d at 1031 (state law claims premised on violations of Exchange Act "necessarily raise disputed issues of federal law of significant interest to the federal system as a whole"); *Gilmore v. Weatherford*, 694 F.3d 1160, 1176 (10th Cir. 2012) ("Although plaintiffs could lose their conversion claim without the court reaching the federal question, it seems that they cannot win unless the court answers that question. Thus, plaintiffs' 'right to relief necessarily depends on resolution of a substantial question of federal law.'") (citation omitted); *Broder*, 418 F.3d at 196 (state law claims premised on cable provider's alleged violations of Communication Act's uniform rate requirement satisfy "*Grable* test for federal question removal jurisdiction").

46.    To the extent that the Court determines that some, but not all, of Plaintiffs' claims state a substantial federal question, the Court can evaluate whether to retain the non-federal claims against the Manufacturer Defendants and Distributor Defendants under the doctrine of supplemental jurisdiction. 28 U.S.C. § 1367(a).

## V.    OTHER REMOVAL ISSUES

47.    Although the Circuit Court of Cook County docket indicates that no defendant has yet been served, service is not a prerequisite for removal. *See, e.g., Novak v. Bank of New York Mellon Trust Co., N.A.*, 783 F.3d 910, 912 (1st Cir. 2015) ("A defendant may remove a state-court action to federal court any time after the lawsuit is filed but before the statutorily-defined period for removal ends."); *Whitehurst v. Wal-Mart*, 306 Fed. Appx. 446, 448 (11th Cir. 2008) ("[N]othing in the removal statute, or any other legal provision, requires that a defendant be served with the complaint before filing a notice of removal."); *Delgado v. Shell Oil Co.*, 231 F.3d 165, 177 (5th Cir. 2000).

48.    By filing this Notice of Removal, McKesson does not waive any available defense and expressly reserves all such defenses, including those related to personal jurisdiction and service of process.

49.    If any question arises as to propriety of removal to this Court, McKesson requests the opportunity to present a brief and oral argument in support of its position that this case has been properly removed.

50.    Pursuant to 28 U.S.C. § 1446(d), McKesson will promptly file a copy of this Notice of Removal with the clerk of the state court where the lawsuit has been pending and serve notice of the filing of this Notice of Removal on Plaintiff.

51.    McKesson reserves the right to amend or supplement this Notice.

**WHEREFORE**, McKesson removes this action, pending in the Circuit Court of Cook

County, Docket No. 2018-CH-12828, to this Court.


October 16, 2018                    /s/              Daniel L. Stanner

                                    Daniel L. Stanner
                                    Kyle A. Cooper
                                    TABET DIVITO & ROTHSTEIN LLC
                                    209 S. LaSalle Street, 7th Floor
                                    Chicago, IL 60604
                                    Telephone: (312) 762-9450
                                    Facsimile: (312) 762-9451
                                    ctabet@tdrlawfirm.com
                                    dstanner@tdrlawfirm.com
                                    kcooper@tdrlawfirm.com

                                    *Attorneys for McKesson Corporation*